IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ROLANDO RENTERIA-CAMACHO,

    Plaintiff,

    v.                             Case No. 14-2529

DIRECTV, INC. and DIRECTV, LLC,

    Defendants.

## MEMORANDUM & ORDER

This matter comes before the court upon defendants DIRECTV and DIRECTV, LLCs' Motion for Summary Judgment (Doc. 68).[1]  Plaintiff Rolando Renteria-Camacho seeks to benefit from the unpaid overtime and minimum wage protections of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219.

Defendant seeks summary judgment for seven reasons: (1) plaintiff was an independent contractor not an employee of defendant and therefore not entitled to overtime compensation; (2) plaintiff cannot show that defendant was his employer; (3) plaintiff has no evidence that defendant knew or should have known he was working overtime without compensation; (4) another judge in this district found that technicians installing DIRECTV systems who were paid by the job are exempt from overtime (5) plaintiff cannot prove the amount of unpaid overtime work he did because he made no record of it; (6) any work completed before September 5, 2010 is time barred by the FLSA's two-year statute of limitations.  The FLSA's three-year statute of limitations only applies to willful violations and plaintiff cannot prove that defendant willfully denied him overtime compensation; and (7) plaintiff is barred from bringing suit by the doctrine of unclean hands because he fraudulently obtained a

---

[1] Since January 1, 2012, defendants merged and do not exist as separate entities.  The court will therefore refer to them as defendant.

technician identification number and worked for defendant under a false identity.  For the reasons explained below, defendant's motion is denied.

I.      Facts

The following facts were stipulated in the parties' pretrial order, or in their briefing:

Defendant is the leading provider of satellite television entertainment services in the United States.  Defendant uses contracting companies or subcontractors who engage technicians to install and service DIRECTV systems. As of 2015 about half of defendant's installations are outsourced. Defendant uses some W-2 employees, some W-2 employees of other entities, and some independent contractors to complete work.  Defendant uses a computer program called SIEBEL to manage work orders (installations, service, calls, or upgrades) for customers and ensure they are completed.  Once a sale is made to a customer, a work order is created in SIEBEL.  Customers book appointment windows and SIEBEL assigns work to technicians based on individual technicians' "Tech ID Numbers."

SIEBEL is not a timekeeping system.  It books appointments based on estimated duration for each work order and does not necessarily reflect the amount of time spent by an individual technician on that job.  Sometimes technicians complete work orders with another tech's ID number.  Speedy Communications, LLC ("Speedy") and Quest Integrated Systems, Inc. ("Quest"), as supervisors, were sometimes able to redistribute work by having technicians complete work orders assigned to other techs' ID numbers.  SIEBEL uses timestamps when work orders are started and completed, but these timestamps are not necessarily accurate if a technician does not check in or out when a job is completed.

Defendant had written Service Provider Agreements ("SPAs") with Speedy and Quest.  The SPAs provided that Speedy and Quest were contractors and would fulfill work orders for the installation and servicing of DIRECTV systems.  The SPAs were intended to create an independent

contractor relationship between defendant and Speedy and Quest.  The SPAs included quality and technical requirements that applied to Speedy and Quest's subcontractors and technicians.  Speedy and Quest then hired independent contractors to do work orders.

Plaintiff worked as a technician installing, repairing, and upgrading defendant's satellite systems between March 2009 and July 2011.  He worked for Speedy between March 2009 and August 2010.  Then he worked for Quest until July 2011, when he went in-house for defendant so that he could take advantage of the benefits offered to in-house technicians.

Defendant promulgates instructions for installations that it provides all contractors.  Defendant requires all contractors who perform work on satellite television services to have the Satellite and Broadcast Communications Association certification.  While he was working for Speedy and Quest, plaintiff never received instructions from a DIRECTV employee about how to do his job.  He also did not receive memos, policies or other communications from defendant while he was working for Speedy and Quest.  Plaintiff's supervisor at Speedy was the only person who conducted a quality control inspection of his work while he was still on site.  When he was working for Quest, plaintiff's supervisor lived in Oklahoma and they only spoke once a week.

If plaintiff was late for an appointment he would contact the customer.  If he had wanted to take a day off, he would have contacted his supervisor at either Quest or Speedy.  Plaintiff was paid directly by Speedy or Quest, not by defendant.  He was paid pre-set, fixed amounts for performing different types of work orders (basic installations, installations of additional receivers, upgrades, and service calls).  Speedy and Quest decided what to pay plaintiff for his work.  Plaintiff received 1099 tax forms from Speedy and Quest when he was working for them.  When he started working in-house for defendant, he received W-2 forms.

Plaintiff purchased materials, such as cabling, from Speedy and Quest after shopping around. He chose to purchase a Toyota Tacoma for about $14,000 to use as a work vehicle, taking into consideration fuel efficiency.  He procured and paid for his own insurance on the truck.  He also had to have a fax machine, computer with internet, cell phone, signal meter, GPS, and certain work attire to complete DIRECTV work orders.  Plaintiff owned these items and did not ask to be reimbursed for them.  He did get tax deductions for at least some of these expenses.  Plaintiff claims that he worked between 50 and 60 hours per week on average.

## II.  Legal Standard

### A.  Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

 The party moving for summary judgment has the burden to show "the lack of a genuine issue of material fact."  *Ascend Media Prof'l Servs., LLC v. Eaton Hall Corp.*, 531 F. Supp. 2d 1288, 1295 (D. Kan. 2008) (citing *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986))).  Once the moving party meets this initial burden, the burden then shifts to the nonmovant to "set forth specific facts showing that there is a genuine issue for trial."  *Id.* (citing *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986))).  The nonmovant may not rest on his pleadings or "rely on ignorance of the facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 259 (1986)); *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).  Instead, the nonmovant is required to set forth specific facts, by referencing affidavits, deposition transcripts, or exhibits, from which a rational trier of fact could find for him.  *Ascend Media*, 531 F. Supp. 2d at 1295 (citing *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000)).

### III.    Discussion

As mentioned above.  Defendant seeks summary judgment on seven grounds.  The court will address each in turn.

### A.    Whether Plaintiff was an Employee or Independent Contractor

The FLSA creates a cause of action against employers who violate the overtime and minimum wage compensation requirements mandated by the Act.  In the Act "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." § 203(d).  An "employee" is generally any individual employed by an employer.  § 203(e)(1).  "Employ" is defined to include "to suffer or permit to work."  § 203(g).

The Tenth Circuit applies an "economic realities" test to determine whether a person is a statutory employee as defined by the FLSA or an independent contractor.  *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 506 (10th Cir. 2012).  The test "seeks to look past technical, common-law concepts of the master and servant relationship to determine whether, as a matter of economic reality, a worker is dependent on a given employer.  *Id.* (citing *Baker v. Flint Eng'g & Const. Co.*, 137 F.3d 1436, 1440 (10th Cir. 1998)).  The test focuses on whether "the individual is *economically dependent* on the business to which he renders service, or is, as a matter of economic fact, in business for himself."  *Id.* (quoting *Doty v. Elias*, 733 F.2d 720, 722–23 (10th Cir. 1984) (emphasis in original)).

Courts use a totality-of-the-circumstances approach when applying the economic realities test.  Some factors the court may consider are:

> (1) the degree of control exerted by the alleged employer over the worker; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the working relationship; (5) the degree of skill required to perform the work; and (6) the extent to which the work is an integral part of the alleged employer's business.

*Id.* (quoting *Baker*, 137 F.2d at 1440).

The court finds that issues of material fact remain as to plaintiff's employment status. The court notes, as others in this district have, that courts across the country have reached varying results at summary judgment and after bench trials in similar cases. *Matrai v. DirecTV, LLC*, 168 F. Supp. 3d 1347, 1353–54 (D. Kan. 2016) (quoting *Thornton v. Mainline Commc'ns, LLC*, 157 F. Supp. 3d 844, 848–49 (E.D. Mo. 2016) (noting that the analysis is fact intensive and that each court must determine the status of the employment relationship before them)). The court finds that in this case, the parties disagree on material facts as well as which facts are important to the court's analysis.

### Degree of Control

When an individual acts autonomously or with some degree of independence this tends to show that he is an independent contractor.

The parties materially disagree about the degree of control defendant exerted over plaintiff. While plaintiff's immediate supervisors were with Quest and Speedy during the relevant time period, plaintiff maintains that defendant retained the power to hire or fire techs. Defendant admits that on at least one occasion it took a technician "out of the field." Although it denies that it maintained the right to hire or fire techs, defendant certainly had the right to constructively fire a tech by simply not assigning him work. Defendant maintained some control over which techs the subcontractors hired by requiring that they meet certain qualifications, including a certification, passing a drug test, and having a background check. Plaintiff claims that the SIEBEL system essentially structured plaintiff's entire work schedule, assigning work orders and tracking plaintiff's hours, at least approximately, based on

when plaintiff checked in and out of jobs.  But defendant claims that SIEBEL was not used for payroll, did not accurately record employees hours worked, and did not retain individual techs' information except as necessary to assign work orders.  Plaintiff claims that defendant maintained more detailed records on technicians.

The degree to which defendant supervised plaintiff or required him to check in with defendant through SIEBEL, or with a supervisor at Quest or Speedy is disputed.  The facts show that at times plaintiff was required to check in daily with a supervisor, but plaintiff also admits that he only spoke to his supervisor at Quest once per week.  Plaintiff claims defendant's control over his work day came largely from SIEBEL.  But the facts are unclear about whether and how much defendant monitored plaintiff's work or work quality.  The facts show that SIEBEL scheduled work orders with plaintiff's tech ID number during specific time windows on specific days.  But the facts also show that plaintiff was able to make some decisions about the order of appointments, was able to run errands during the work day, could ask a supervisor at Speedy or Quest for more work on slow days, and was sometimes able to get more work by taking jobs assigned to other techs.  Whether SIEBEL's assigned schedule allowed for much variation is still at issue.  The court finds that material issues of fact remain on the degree of control defendant exercised, specifically through the SPAs and SIEBEL.

### Plaintiff's Opportunity for Profit and Loss

Independent contractors typically assume the risk of profit and loss associated with an independent business.  Plaintiff argues that he was not in business for himself because he was paid a set amount per job, did work without pay when jobs were not completed, and that his pay was set, at least indirectly, by defendant because defendant's SIEBEL system generally determined which jobs plaintiff received.  It also appears that plaintiff's income was based nearly, if not entirely, on income generated from defendant's business.  Defendant adamantly denies setting technician pay, except for

its own W-2 employees.  Instead, defendant claims that subcontractors like Speedy and Quest had the discretion to determine what to pay employees.

While plaintiff had the ability to seek more work, the record is unclear about how often plaintiff was able to take on more jobs. The facts show, for example, that neither plaintiff nor the supervisors at Speedy and Quest had the ability to reassign technicians in SIEBEL, or to give plaintiff additional assignments.  Therefore, plaintiff's opportunity to increase profits based on jobs assigned could have been extremely limited—especially as it appears that the opportunity to take on additional jobs was limited to that day.  On the other hand, there is evidence that plaintiff may have earned income from selling additional products to customers when working on a job.  The court finds that material issues of fact remain on this factor.

### Plaintiff's Investment in the Business

Plaintiff made substantial investments in equipment when he purchased his work truck, the insurance on the truck, a fax machine, computer, cell phone, GPS, and any uniform he was required to wear.  Plaintiff took tax deductions on at least some of this equipment and did not seek reimbursement from Speedy, Quest, or defendant.  "Courts have generally held that the fact that a worker supplies his or her own tools or equipment does not preclude a finding of employee status." *Dole v. Snell*, 875 F.2d 802, 810 (10th Cir. 1989) (noting that investments under the test should include large capital expenditures such as risk capital and capital investments, and compared the investment in worker equipment to the investment of the business or business owners themselves to determine whether the investment was substantial).  Courts in this district typically employ a comparison between the worker's investments to the employer's investment in the overall business operation.  Although plaintiff's investments seem substantial, they are very small compared to the amount defendant, or

even Speedy or Quest invested in their operations.  The court finds that this element tends to weigh in plaintiff's favor.

### Permanence of the Working Relationship

Generally, independent contractors have fixed employment periods and transfer from place to place as work becomes available; employees work for one employer and their relationship is continuous and indefinite.  *Dole*, 875 F.2d at 811.  Defendant argues that plaintiff had no contract with defendant and that there was no permanence in plaintiff's employment, demonstrated by his initial work for Speedy, and when that job ended, for Quest.  Plaintiff claims that he installed DIRECTV systems for over a decade, working 50-65 hours per week.  The court finds that issues of material fact remain on this factor; plaintiff could have sought other work while he was installing DIRECTV systems, but he apparently did not.  Even though he worked for separate subcontractors during his tenure, the facts do not establish that the work plaintiff performed underwent significant change.

### Degree of Skill

Specialized skills are more likely to indicate that a worker is an independent contractor. Material issues of fact remain on whether plaintiff's work was highly skilled or technical.  Defendant's SPA agreements with Speedy and Quest required certain quality and technical requirements for subcontractors and their technicians.  Technicians were required to have a certification, pass drug screening, and background checks.  But plaintiff also claims that he received no additional training over the period of time he worked for Speedy or Quest.  Plaintiff did take a recertification test at a DIRECTV site while he was working for the subcontractors.  Plaintiff never received instructions, memos, policies, or other communications directly from defendant while he worked for the subcontractors regarding how to do his job.  Defendant and plaintiff directly disagree about whether

plaintiff's job, installing and maintaining satellite television equipment, is complicated or can be done with minimal training. The court finds that material issues remain on this element.

*Extent Plaintiff's Work was Integral to Defendant's Business*

Courts consider whether the type of work performed by an individual is integral to the business at issue. Here, defendant is in the business of providing satellite television systems and service to customers. Defendant cites an Eastern District of Arkansas case that says that a business's dependence on independent contractors does not in and of itself indicate an employment relationship. The court finds that plaintiff's argument that defendant would have no business without technicians to install satellite systems and maintain them shows more than mere dependence. Plaintiff's argument is sufficient to establish a material question of fact as to whether plaintiff's work was integral to defendant's business.

For all the reasons discussed above, and viewing the evidence in the light most favorable to plaintiff, the court finds that material issues remain regarding plaintiff's economic dependence on defendant and therefore the status of their employment relationship. The intensive fact-finding necessary to determine whether plaintiff was an independent contractor or employee should be left to the trier of fact. Summary judgment is therefore not appropriate on plaintiff's employee status.

## B.    Whether Defendant was Plaintiff's Joint Employer

The Tenth Circuit has not yet adopted a test to determine whether two entities are joint employers under the FLSA. The Department of Labor has outlined when multiple parties may be jointly liable under the FLSA due to a joint-employer relationship. The regulation states that an "individual may stand in the relation of an employee to two or more employers at the same time." 29 C.F.R. § 791.2(a). This joint-employment relationship exists when "the employee performs work

which simultaneously benefits two or more employers. . . ." *Id.* § 791.2(b).  The regulation lists specific examples of when this might occur, such as:

> [w]here one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or . . . [w]here the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

*Id.* § 791.2(b)(2), (3).   Courts are to consider all the facts in a particular case when determining whether a joint-employment relationship exists.  *Id.* § 791.2(a).  At least one court in this circuit simply applied the economic realities test to determine whether a party should be considered a joint employer.  *See, e.g.*, *Coldwell v. Ritecorp Envtl. Prop. Solutions*, No. 16-1998-NYW, 2017 WL 1737715, at *5 (D. Colo. May 4, 2017) (noting at the same time that most tests used to determine whether a joint-employer relationship exists require the court to make a totality of the circumstances determination). The Tenth Circuit first applied the economic realities test, to determine whether plaintiffs were independent contractors or employees, noting that the focus of the test is "whether the individual is economically dependent on the business to which he renders service . . . or is, as a matter of economic fact, in business for himself."  *Johnson v. Unified Gov't of Wyandotte Cnty./Kansas City, Kan.*, 371 F.3d 723, 729 (10th Cir. 2004) (quoting *Dole*, 875 F.2d at 805)).  Because the Tenth Circuit upheld the jury's verdict finding the plaintiffs were independent contractors, it did not address joint employment.

      The parties both cite to cases from other districts implementing a four-factor test for determining whether a joint-employment relationship exists.  Out of an abundance of caution, the court will briefly address these factors in addition to the economic realities test discussed above.  The factors the parties cite are: "whether the alleged employer has the power to hire and fire employees, supervises and controls employee work schedules or conditions of employment, determines the rate and method

of payment, and maintains employment records." *Matrai*, 168 F. Supp. 3d at 1353 (listing the factors along with those considered as part of the economic reality test).

The court finds that material issues of fact remain as to whether defendant should be held liable as a joint employer under the FLSA for any unpaid overtime or minimum wage violations. Recognizing that the economic realities test necessarily requires examining many of the same facts as the factors listed by the parties for determining whether a joint-employment relationship exists, the court will keep its discussion of these factors brief.

### Power to Hire and Fire

As discussed above, material issues of fact remain as to whether defendant had the right to hire or fire plaintiff and other technicians. Defendant at the very least had some authority over who was hired or fired because it set certain minimum requirements in the SPA agreements with subcontractors. Plaintiff also claims that defendant at least sometimes advised or discussed when to hire additional technicians or when there were more techs than necessary. Although defendant may not have decided to officially hire or fire technicians, it had the right to stop assigning certain technicians work or take a technician out of the field.

### Supervision or Control of Work Schedules and Conditions of Employment

As discussed above, the SIEBEL system, viewing the facts in the light most favorable to plaintiff, generally dictated plaintiff's schedule. SIEBEL assigned work orders in specific time slots. Although plaintiff could and did call a customer if he was running late, he generally had to abide by the schedule set by SIEBEL. The facts support that plaintiff was, at times, able to pick up additional jobs on a given day by requesting more jobs from a supervisor either at Speedy or Quest. However, the facts do not show that this flexibility actually allowed plaintiff any significant control over his schedule. There is also evidence in the record that plaintiff was required to adhere to certain

conditions of employment including, but potentially not limited to: a uniform, driving a "work truck," and meeting conditions of employment such as keeping a current certification and adhering to defendant's guidelines.

*Rate and Method of Payment*

Plaintiff admits that his checks came directly from Speedy and Quest or sometimes even a personal check by a supervisor. Plaintiff argues that because defendant paid Speedy and Quest based on the number and type of jobs they completed, it practically determined the rates at which the subcontractors in turn paid him, by the number and type of jobs he completed. Plaintiff also argues that defendant issued chargebacks when customers complained, technicians were late, or work was not done properly, and that these costs were passed on to plaintiff. Defendant argues that it had no knowledge of how Quest and Speedy paid technicians. The court finds that although this factor tends to lean in defendant's favor, sufficient issues of material fact remain, especially whether defendant knew technicians were required to absorb the cost of chargebacks.

*Maintenance of Employment Records*

Defendant consistently claims that it maintained no payroll records for plaintiff while he was employed by the subcontractors and that the only information it had on plaintiff was part of the SIEBEL work order system. Defendant claims that the information maintained by SIEBEL included each tech's name, preferred starting address, schedule, skill set, professional certifications, work order history, and confirmation that he passed his background test. Defendant tracked performance data on subcontractor technicians and provided it to subcontractor companies. And the SPAs that defendant had with Speedy and Quest required the subcontractors to maintain a file on each technician to be available for defendant to audit. The files were to include all background checks and negative drug screenings. Whether the information maintained by SIEBEL and in the files mandated by the SPAs

was merely for quality control purposes or whether they were the type of employment or personnel records that would tend to show a joint-employment relationship remains an issue of material fact for determination by the jury.  At a minimum, keeping track of a technician's schedule and starting address does not have an obvious quality control purpose.  For these reasons summary judgment is not appropriate on the basis that plaintiff cannot show that defendant was his joint employer.

### C.    Whether defendant knew plaintiff was working unpaid overtime

In addition to showing that he was employed by defendant, plaintiff must show that defendant knew or should have known he was working overtime without compensation.  *Whitaker v. Pac. Enters. Oil Co. (USA)*, 956 F.2d 1170 (10th Cir. 1992).  Defendant argues that plaintiff cannot meet this burden based on many of the same disputed facts that were involved in the previous two sections. Defendant claims that it had no actual knowledge of plaintiff's hours, because plaintiff never told anyone at DIRECTV that he was working overtime and defendant had no records of plaintiff's hours. Even if plaintiff could show that defendant had knowledge of the overtime hours plaintiff allegedly worked, defendant argues plaintiff would have to show that defendant knew plaintiff was not paid for them.

Plaintiff responds that defendant was on notice of plaintiff's overtime because defendant retained control of the plaintiff's schedule through the SIEBEL system.  As discussed above, material issues remain about the SIEBEL system.  Viewing the evidence in the light most favorable to the non-moving party, here plaintiff, there is sufficient evidence that defendant at least should have known that plaintiff was working overtime.  Plaintiff worked, if not exclusively, nearly exclusively for defendant (the exact nature of that relationship to be determined by the jury).  Plaintiff claims that he worked on average around 10 to 15 hours of overtime weekly.  Plaintiff also testified that defendant was a more proactive supervisor than it claims, even calling plaintiff if he did not show up to a job or if he forgot

to check himself in as present at a job assigned by the SIEBEL system.  Even if subcontractors and technicians were able to swap some work assignments, rendering the SIEBEL system less than completely accurate, viewing the facts in the light most favorable to plaintiff, subcontractors' and technicians' ability to do so was extremely limited.  This is sufficient evidence that, at the very least, defendant should have known plaintiff was working overtime.

Regarding whether defendant knew that plaintiff was not paid for his overtime work, plaintiff's additional statement of fact paragraph 59 states that "Both of the subcontracting companies . . .  only paid on a piece rate basis for closed order line items on DIRECTV work orders; a fact that DIRECTV was aware of."  (Doc. 81 at 56.)  Defendant did not dispute this fact, responding only that "Defendants do not dispute that the pay Plaintiff received may have been referred to as piece rate, but under *Matrai v. DIRECTV, LLC* . . . such pay was legally commissions."  (Doc 89. at 20.)  The court therefore finds the issue of defendant's knowledge about how plaintiff was paid as undisputed for purposes of this motion.  Fed. R. Civ. P. 56(e)(2).  Plaintiff claims that this fact in conjunction with the fact that defendant paid its W-2 employees an additional amount shows that it should have known that plaintiff was not paid for overtime.  The court finds that issues of material fact remain as to whether defendant knew that plaintiff worked unpaid overtime hours in violation of the FLSA.  A reasonable trier of fact could find that plaintiff worked overtime and was not compensated for it.  Summary judgment on the issue of defendant's knowledge is therefore denied.

### D.    Whether defendant is exempt from paying overtime pursuant to § 207(i)

Section 207(i) provides an exemption to the FLSA's overtime payment requirements if: (1) plaintiff received a regular pay rate exceeding one and one-half times the minimum wage, (2) defendant is a retail or service establishment, and (3) plaintiff received more than half his

compensation from commissions during the representative period.  29 U.S.C. § 207(i); *Matrai*, 168 F. Supp. 3d at 1358 (D. Kan. Mar. 4, 2016).

Whether an exemption applies is a mixed question of fact and law.  *Id.*  (quoting *Myers v. Hertz Corp.*, 624 F.2d 537, 548 (2d Cir. 2010)).  How workers used their time is a question of fact and whether the activities exclude them from overtime compensation based on the exception is a question of law.  *Id.*  Defendant bears the burden of proving the exception by a preponderance of the evidence. *Id.*  The test is conjunctive so failure to prove any element is determinative.

*Plaintiff's Regular Rate of Pay*

On the first element, defendant notes that the federal minimum wage is $7.25 as provided by 29 U.S.C. § 206.  One and one-half times $7.25 is $10.875.  Defendant argues that plaintiff's deposition testimony admitted that he made $12.67 hourly in response to questioning about damages.  Defendant bases this estimate on plaintiff's response to an interrogatory seeking explanation of plaintiff's damage calculations (Doc. 82-4 at 4) as well as plaintiff's deposition testimony (Doc. 82-6 at 105–114). However, plaintiff's response to the interrogatory and deposition questioning are not based on the actual number of hours worked, plaintiff's pay, and costs.  All the numbers are estimates because defendant's employer did not track his hours or pay.

Plaintiff testified that he estimated his income at less than $10 per hour.  Plaintiff's testimony— involving defense counsel calculating a hypothetical wage based on plaintiff's estimates of the time he worked and his expenses—demonstrates that his damages calculations were estimates, including vehicle payments, insurance, fuel, internet, phone, materials, and a few other things plaintiff could not think of at the time.  Plaintiff explained that he was not paid for jobs that "didn't go through or rescheduled, cancelled at the door."  (Doc. 82-6 at 112.)

The parties have not provided and the court has not found any binding case law on this part of the test. The only case the parties refer to in regard to this issue is *Johnson v. Wave Comm GR LLC*, 4 F. Supp. 3d 423 (N.D.N.Y. 2014). Although for the exemption in general, defendant relies heavily on *Matrai*, which found defendant exempt under the § 207(i) exemption, the plaintiffs' regular rate of pay in that case was not disputed. *Matrai*, 168 F. Supp. 3d at 1358. In *Matrai*, the parties agreed that plaintiffs' rate of pay was $32.11. *Id.* Although the court in *Johnson* is persuasive, not binding authority, and it determined whether an entire class of plaintiffs' regular rate of pay was one and one-half times the minimum wage, the court's well-reasoned analysis is still applicable here.

The Department of Labor regulations interpreting the § 207(i) exemption clearly require the party seeking exemption to prove that the employee in question was paid at least one and one-half times minimum wage *in each particular workweek.* 29 C.F.R. § 779.419(a) (emphasis added). "The Act takes a single workweek as its standard and does not permit averaging of hours over 2 or more weeks." § 778.104 (noting that a worker's compensation must be calculated on a weekly basis even for pieceworkers or those paid on a commission).

The United Supreme Court has described the "regular rate" as "the hourly rate actually paid the employee for the normal, non-overtime workweek for which he is employed." *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945). The Court further noted that "[i]t is not an arbitrary label chosen by the parties; it is an actual fact." *Id.* The Supreme Court in *Walling* and the district court in *Johnson*, both went on to compute a regular rate based on the actual wages paid and hours worked for the employees in those cases. In *Johnson*, the court determined that the employer was not entitled to the § 207(i) exemption for the weeks that it had not tracked its employees' actual hours, because it could not prove that its employees were compensated at a rate of at least one and one-half times the minimum wage for each week worked during that period. 4 F. Supp.

3d at 446.  The court finds that the same reasoning applies in this case.  Plaintiff's employer, whoever that is determined to be, on the record before the court, did not track plaintiff's hours and pay, and is therefore unable to prove plaintiff's regular rate of pay during any week.  Like many remaining issues of material fact in this case, how plaintiff used his time should be determined by the trier of fact.

As the party seeking the exemption, it is defendant's burden to prove plaintiff's regular rate of pay, providing a computation, and it has failed to do so.  Therefore the court need not address the remaining two elements.  There is not a sufficient basis to find defendant is entitled to the § 207(i) exemption or to grant summary judgment for defendant on that basis.

### E.     Whether plaintiff can prove his overtime work

Plaintiff has the burden to show that he performed work for which he was not properly compensated.  *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946), *superseded by statute*, 29 U.S.C. § 254, *as recognized in Integrity Staffing Solutions, Inc. v. Busk*, 135 S. Ct. 513, 516 (2014). He must provide "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."  *Id.*  If plaintiff meets this burden, the employer has the burden to show evidence of the precise amount of work performed.  Employers are required to "make, keep, and preserve such records of the persons employed by him, and shall preserve such records . . . ."  29 U.S.C. § 211(c).  This is particularly the case where plaintiff claims that an employer failed to keep adequate records.

Both the Tenth Circuit and this court have found that a plaintiff's best recollection is sufficient to prove damages.  In this case, plaintiff testified repeatedly that his overtime hours were between 10 and 15 hours per week.  Plaintiff also provided testimony that he was uncompensated for drive time and business expenses.  Plaintiff has met his burden to show that he performed work for which he was not sufficiently compensated.  If a jury were to find that plaintiff was defendant's employee, defendant

would have the obligation to maintain employment records as required by § 211(c).  If defendant did not do so, and cannot prove plaintiff's hours and pay, plaintiff's recollection will suffice.  *See, e.g.*, *Robinson v. Food Serv. of Belton, Inc.*, 415 F. Supp. 2d 1232, 1235 (D. Kan. 2005); *Koehler v. Freightquote.com, Inc.*, No. 12-2505-DDC-GLR, 2015 WL 4203962, at *25–*28 (D. Kan. July 10, 2015).

Defendant seeks to hold plaintiff to a higher standard of proof.  It argues that plaintiff should be required to provide more evidence than his assertions under oath.  However, the Supreme Court specifically provided that courts may award damages "even though the result be only approximate" if an employer fails to prove the precise amount of work performed.  *Mt. Clemens*, 328 U.S. at 688. Employers have the statutory duty to keep records, not employees.

Defendant claims that plaintiff's estimates are contradictory and inconsistent.  But defendant does not offer any evidence rebutting plaintiff's estimates.  A jury can decide the credibility of plaintiff's estimates.  Because plaintiff has presented sufficient evidence to create a just and reasonable inference that he worked between 10 and 15 hours of overtime per week without compensation, the burden shifts to defendant to prove, or disprove, the estimate.  The court therefore denies summary judgment on the issue of proving damages.

## F.    Whether Defendant Willfully Violated the FLSA

The FLSA imposes a two-year statute of limitations unless plaintiff can show that defendant's violations of the Act were willful, in which case a three-year statute of limitations applies.  *Mumby v. Pure Energy Servs. (USA), Inc.*, 636 F.3d 1266, 1270 (10th Cir. 2011) (citing 29 U.S.C. § 255(a)).  To show willfulness, plaintiff must show that "the employer either knew or showed reckless disregard for the matter of whether its conduct violated the statute."  *Id.* (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).  "Reckless disregard can be shown through action entailing an unjustifiably

high risk of harm that is either known or so obvious that it should be known." *Id.* (citing *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 68 (2007)).  The Supreme Court has noted that the "fact that Congress did not simply extend the limitations period to three years, but instead adopted a two-tiered statute of limitations, makes it obvious that Congress intended to draw a significant distinction between ordinary violations and willful violations." *McLaughlin*, 486 U.S. at 132.

Plaintiff has two main arguments; the first is that defendant's business structure shows willful violation of the FLSA.  Plaintiff suggests that defendant intentionally tried to maintain plausible deniability by calling technicians independent contractors, while retaining control over all aspects of technician employment.  Plaintiff cites to evidence in the record, that viewed in the light most favorable to plaintiff shows that defendant set requirements and prerequisites for hiring and firing decisions, conditions on technician employment (including drug testing, certifications, uniforms, work vehicles, what techs were supposed to say and how they were to perform their work), and supervising techs on a day-to-day basis (including setting the technicians' schedules without much room for flexibility).

Plaintiff argues that defendant's decision to use a tiered employment scheme, in and of itself, is evidence of willful violation.  This type of employment scheme—where a business splits off the functions that were once handled entirely internally—is sometimes referred to as "fissured employment." *See, e.g.*, *Arnold v. DirecTV, LLC*, No. 10-352-JAR, 2017 WL 1196428, at *14 (E.D. Mo. Mar. 31, 2017) (finding that willfulness is a question of fact and determining that summary judgment on the issue of willfulness should be denied where plaintiff argued that DirecTV's history of litigation involving FLSA violations and "fissured employment" scheme were evidence of willfulness).

Defendant relies on a District of New Hampshire case, arguing that fissured employment schemes are not per se illegal under the FLSA. *Chesley v. DIRECTV, Inc.*, No. 14-468-PB, 2015 WL

3549129, at *7 (D.N.H. June 8, 2015). The court in *Chesley*, found that "[a]t most, the allegation shows that the defendants were aware of the FLSA and attempted to align their conduct in a manner that was cost-effective for them while not violating the FLSA" and that such allegations were insufficient to survive a motion to dismiss. *Id.* But at least one court in this circuit decided the other way. *See Collins v. DIRECTV, Inc.*, No. 14-635-GKF-TLW, 2015 WL 1297737, at *5–*6 (N.D. Okla. July 8, 2015) (finding that a plaintiff's detailed allegations of a system by which DIRECTV deliberately attempted to shirk FLSA responsibilities by classifying them as independent contractors was sufficient to survive a motion to dismiss).

The court agrees that while such schemes are not per se violations of the FLSA, they do raise significant questions about whether such schemes undermine workers' access to the FLSA's benefits, including basic labor standards like minimum wage and overtime compensation. Such schemes are on the Department of Labor's radar and the court is unwilling to create case law that automatically disregards arguments like plaintiff's. *See* U.S. Dept. of Labor, *Time to Negotiate a Social Compact 2.0?*, U.S. Dept. of Labor Blog (Jan. 9, 2016), https://blog.dol.gov/2016/01/09/time-to-negotiate-a-social-compact-20. The court finds that plaintiff has provided sufficient evidence that a reasonable trier of fact could find that defendant's employment scheme demonstrates willful violation of the FLSA.

Second, plaintiff argues that defendant's prior involvement in litigation or investigation shows that its violations were willful. Plaintiff specifically mentions that defendant has been involved in "cases brought by the Department of Labor [] undersigned counsel, . . . and at least 20 different lawsuits alleging wage and hour violations involving technicians working within [defendant's] provider network." (Doc. 81 at 90.) In *Chao v. A-One Medical Services, Inc.*, the Ninth Circuit found that the defendant's previous "run-ins" with the Department of Labor put it on notice and that "[w]hile

mere knowledge that the FLSA was in the picture may not be enough to sustain a finding of willfulness . . . [a defendant's] former violations, even if they were a different kind, evidenced at least reckless disregard for the legality of defendant's actions.  346 F.3d 908, 919 (9th Cir. 2003).

In a similar case, the Tenth Circuit found that there was sufficient evidence of willfulness where plaintiff provided affidavits showing that the owner of a travel agency had actual knowledge of the FLSA's overtime provisions prior to the suit and disregarded them.  *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 967 (10th Cir. 1991).  In that case, plaintiff showed that a prior version of the owner's business had been investigated by the FLSA for overtime violations, the company agreed to pay unpaid overtime wages as part of an agreement to settle the matter, and then ultimately refused to pay the overdue overtime wages.  *Id.*  The plaintiffs in that case also provided the investigating officer's affidavit, explaining that the reason for the present suit was the owner's continued violation of the same FLSA requirement to include commission payments when calculating overtime compensation.  *Id.*

Although the Tenth Circuit does not "require that violations be established through litigation in order to establish later violations were willful," *Reich v. Monfort, Inc.*, 144 F.3d 1329, 1335 (10th Cir. 1998), plaintiff's reliance on prior litigation as a basis for a willfulness finding requires something more than simply showing that defendant has been involved in substantial FLSA litigation.

Plaintiff's evidence consists of references to several cases where defendant bought out or fulfilled a judgment on behalf of a contractor.  Plaintiff's statements of fact and argument, unlike the affidavits provided in *Dole*, do not conclusively show that defendant was found liable for the type of FLSA violations alleged in this suit or that defendant admitted liability.  Many settlement agreements specify that no party admits liability.  However, the court finds this evidence sufficient to survive summary judgment, especially combined with plaintiff's argument that defendant intentionally

structured its business to avoid FLSA requirements.  Because plaintiff provided sufficient evidence from which a reasonable trier of fact could find that defendant willfully violated the FLSA, summary judgment is denied on the issue of willfulness.

###### G.  Whether Plaintiff's Claims Should be Barred

Defendant argues that plaintiff should be barred by the doctrine of unclean hands from bringing his claims because he assumed his father's identity to obtain a technician ID number from defendant, by using his father's name and other information and by having his father complete the background check and take the drug test.

Unclean hands is an equitable defense that provides that "he who comes into equity must come with clean hands."  *Keystone Driller Co. v. Gen Excavator Co.*, 290 U.S. 240, 241 (1933).  Defendant does not cite any case law that applies the doctrine of unclean hands to completely bar recovery in an FLSA case.  But when courts do apply it, they typically require the party asserting it to show that any misconduct be related to plaintiff's cause of action.  *Worthington v. Anderson*, 386 F.3d 1314, 1320 (10th Cir. 2004).  Defendant argues in its reply that plaintiff "likely would not have received a technician number . . . . because if Plaintiff had been honest and used his own name, he never would have been able to file this lawsuit in the first place."  (Doc. 89 at 46.)  The court finds this assertion speculative at best.  At the very least, there is evidence that one of defendant's subcontractors encouraged or facilitated defendant's use of his father's identity to obtain employment. Plaintiff's testimony expresses a belief that the subcontractors were in such close communication with defendant that defendant also would have known.

Whether or not defendant knew plaintiff was using his father's identity, the court finds that it would be inappropriate to deny plaintiff any recovery at this time based on the doctrine of unclean hands.  The Supreme Court noted that "The legislative debates indicate that the prime purpose of the

legislation was to aid the unprotected, unorganized and lowest paid of the nation's working population. . . ." *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 n.18 (1945).  Especially in cases where a supervisor or employer knew or should have known that an employee was engaged in misconduct, such misconduct should not be a total bar to recovery.  *See Bailey v. TitleMax of Ga., Inc.*, 776 F.3d 797, 801–805 (11th Cir. 2015) (additionally noting that statutes like the FLSA have a deterrent purpose, and private litigants serve the purpose of deterring illegal employment practices and rectifying individual rights to compensation.  Allowing a complete bar to recovery in such cases undermines the FLSA's deterrent purpose).

The court denied defendant's motion for summary judgment on the basis that plaintiff was not defendant's employee or that defendant was plaintiff's joint employer.  Plaintiff has presented evidence that his supervisors—or even vicariously defendant—encouraged, facilitated, or condoned plaintiff's assumption of his father's identity to obtain employment under false pretenses.  It would be unjust for the court to acknowledge this evidence and also find as a matter of law that plaintiff is unable to bring his claims under the FLSA.  Summary judgment is denied.

**IT IS THEREFORE ORDERED** that defendant's Motion for Summary Judgment (Doc. 68) is denied.  The parties shall contact the court within 30 days of this order to schedule trial.

Dated October 16, 2017, at Kansas City, Kansas.

s/ Carlos Murguia
**CARLOS MURGUIA**
**United States District Judge**